STATE of Delaware, DEPARTMENT
OF TRANSPORTATION,
Plaintiff,

v.

FIGG BRIDGE ENGINEERS, INC.

and

AMEC Environmental & Infrastructure,
Inc., f/k/a AMEC E & I, Inc., f/k/a
MACTEC Engineering and Consult-
ing, Inc., Defendants.

C.A. No. S11C–01–031 RFS.

Superior Court of Delaware,
Sussex County.

Submitted: June 14, 2013.

Decided: Aug. 13, 2013.

Frederick H. Schranck, Esquire, Deputy Attorney General, Dover, DE, Mary Page Bailey, Esquire, Deputy Attorney General, Wilmington, DE, for plaintiff Department of Transportation.

J. Scott Shannon, Esquire, Artemio C. Aranilla, Esquire, Marshall Dennehey Warner Coleman & Goggin, Wilmington, DE, for defendant Figg Bridge.

Timothy Jay Houseal, Esquire, William E. Gamgort, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Craig A. Karsnitz, Esquire, Young Conaway Stargatt & Taylor, LLP, Georgetown, DE, for defendant Mactec Engineering and Consulting, Inc.

John H. Osorio, Esquire, Marshall Dennehey Warner Coleman & Goggin, Cherry Hill, NJ, for defendant Figg Bridges' Pro Hac Vice.

John Anthony Wolf, Esquire, John F. Morkan III, Esquire, Anthony F. Vittoria, Esquire, Ian I. Freidman, Ober Kaler, Baltimore, MD, for plaintiff Pro Hac Vice.

James F. Lee Jr, Esquire, Michael F. Germano, Esquire, Joseph M. Gesker, Jr., Esquire, Lee & McShane, P.C., Washington DC, for defendant Mactec's Pro Hac Vice.

## OPINION

STOKES, J.

Defendant AMEC Environmental & Infrastructure, Inc. ("AMEC") has filed a motion to compel documents in the possession of non-party Golder Associates ("Golder"). The State of Delaware Department of Transportation ("the Department") opposes the motion, arguing that 178 of the 181 the documents sought are exempt from discovery under what it calls the "executive/deliberative process privi-

lege."[1] This nomenclature is clarified in a later section.

Delaware Uniform Rule of Evidence ("DRE") 508 recognizes certain governmental privileges based on both federal and state law. However, the Department, as the moving party, has not meet its burden to show that the executive/deliberative process privilege applies in this litigation. Therefore, AMEC's motion to compel is granted as to the 178 documents for which the Department asserts the executive/deliberative process privilege.

## Facts

The Indian River Inlet Bridge ("the Bridge") spans the Indian River Inlet and carries State Route 1 over the Inlet. Plaintiff is responsible for ensuring that the Bridge is maintained in safe condition for transport of people and goods over the Bridge.

In 2002, Plaintiff started plans to replace the Bridge. In June 2003, Plaintiff and Figg entered into a design Agreement ("the Agreement") for the new bridge ("the Project"). The roadway approaches, as designed by Figg and another subconsultant, consisted of earthen embankments retained by six mechanically stabilized earth ("MSE") walls, concrete facing and stabilized slopes. The Agreement identified the subconsultants Figg would hire for each facet of the Project. As specified, Figg engaged Defendant AMEC as the subconsultant responsible for performing a site assessment and a Preliminary Foundation Study for both the roadway and the Bridge structure. AMEC is a geotechnical engineering firm. Its reports contained information of expected rates of settlements and time rates of consolidation for the embankments. In December 2003, AMEC submitted an expanded Final Roadway Report. In May 2005, AMEC submitted a revised Report reflecting higher rates of settlement.

Construction of the embankment and roadway started in June 2005 under a contract between Plaintiff and Kuhn Construction Co. ("Kuhn"). Actual deformation of the MSE walls continued at a rate greater than that predicted by AMEC. Other project participants registered concern about settlement of the soft clay under the embankments.

In 2006, Plaintiff adopted an accelerated design and construction concept in order to avoid further damage. The new structure would incorporate the earthen embankments designed by Figg based on AMEC data. Much later, investigation established that AMEC's 2005 report contained significant inaccuracies. Plaintiff submitted White Papers to the Federal Highway Administration ("FHWA"), which reflected the ongoing problems and recommended an independent investigation. The FHWA concurred. The independent investigation confirmed that long-term vertical settlement was greater than that stated in the AMEC report.

Construction continued, although not smoothly. In the fall of 2007, Plaintiff decided on significant replacement of the embankments designed by Figg based on AMEC's input. Based on the latest White Papers, the FHWA agreed.

Deconstruction of the embankments and the MSE walls designed by Figg took place between May and December 2008. Plaintiff engaged the engineering firm of O'Connell & Lawrence, Inc. ("OCL") to conduct an investigation into what went wrong. OCL retained Golder Associates, Inc. ("Golder"), a geotechnical consulting firm. Representatives of both firms were

---

1. The Department asserts the attorney/client privilege for one document and work product immunity for two documents. These matters are resolved in a companion Judicial Order.

on-site during deconstruction to perform field tests and measurements. They found nothing to indicate that the building contractor, Kuhn, caused or contributed to the embankment deficiencies.

According to Paragraph 70 of the Complaint, Plaintiff informed Figg and AMEC by letter dated October 23, 2008, that because of serious concerns with the engineering studies for and design of the Bridge, the parties should "begin consideration and discussion" of the error and/or omissions ("E & O") process, which is a dispute resolution process. However, at argument counsel for the Department stated that "In November of 2007, the Department provided formal notice of the intention to file this errors and omissions policy." [2]

As part of the E & O process, the Department's project manager transmitted to Defendants the provisional findings of errors and omissions on Defendants' part, as well as Golder and OCL's assessments. Golder found six instances where AMEC had failed to meet the applicable standard of care. Plaintiff adopted the Golder findings in January 2011 and alleged them in the Complaint. AMEC refused to participate in the E & O process, stating that it would serve in an advisory capacity to Figg.

The Department filed suit because AMEC refused to participate in resolving the financial responsibility of Figg and AMEC for AMEC's multiple errors and omissions. AMEC served a subpoena *duces tecum* on non-party Golder. The Department argues that 178 of the 181 documents are protected by the executive/deliberative process privilege.

## Discussion

**The executive/deliberative process privilege.** This privilege permits the government to withhold documents that reflect opinions, recommendations and deliberations that are part of a governmental decision-making.[3] As an initial matter, that agency decision must be identified. The Department in its motion asserts that the decision in question is January 20, 2011, the date of the project manager's report concluding that AMEC did not comply with applicable professional standards.

AMEC correctly asserts that the date is uncertain and that the Department has discussed various dates but has not identified the significant one.

The Department, as a State agency, decided to initiate the contractual E & O process because of the failures of the project and the need for deconstruction, with which the FHWA agreed. This agency decision is the operative one that set in motion an investigatory procedure focused on identifying causation and also undertaken in anticipation of litigation.

On November 13, 2007, the Department formally communicated to Figg that the E & O process would begin and that Figg should convey this information to its subcontractors. The letter stated the Department's "intentions to thoroughly investigate and review the design decisions and recommendations offered by [Figg's] design team over the course of [the] project" pursuant to the E & O process.[4] By that time, the decision to pursue E & O had been made in part in anticipation of litigation. The parties knew from experience in the field that AMEC had provided contradictory and unreliable information

---

**2.** Transcript of Proceedings (April 25, 2013) at 14, ll. 8–10 (hereinafter referred to as "Tr. at ——.")

**3.** *In re Liquidation of Integrity Ins. Co.,* 165 N.J. 75, 754 A.2d 1177 (2000).

**4.** Motion to Compel at 2.

throughout the construction process and that the unreliable data could well be the cause of the degradation of the project. Under the Agreement, the E & O process was investigatory in nature and followed the Department's decision to remove the bridge's supports and embankments. The contractual E & O process is discussed *infra.* The agency decision that triggered the executive/deliberative process privilege, if one is found to exist in Delaware, is November 13, 2007.

The executive/deliberative process privilege does not protect purely factual matters unless the facts are inextricably intertwined with the decision-making process.[5] The Department bears the burden to establish a *prima facie* claim to the executive/deliberative process privilege, and does so by showing that each document sought is both predecisional and deliberative.[6] If that burden is met, the burden shifts to the Defendant to show substantial need.[7]

Under DRE 508(a), a privilege can be claimed in Delaware that exists because of a mandatory federal Constitutional privilege. The federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, establishes general disclosure of public documentation for federal agencies unless the information fits one of nine exceptions. The fifth exception applies to "intra-agency memorandums," interpreted by case law to mean public documents which a private party could not discover in civil litigation with the agency.[8] The deliberative process privilege is recognized under federal common law, and FOIA was enacted by Congress under the United States Constitution.[9] The federal FOIA does not govern Delaware common law nor does it affect rights reserved to the states under the federal Constitution. Thus, DRE 508(a) does not provide a basis for the assertion of the privilege.

■ The next question is whether the claimed deliberative process privilege is applicable under DRE 508(b). The answer is no. In *Guy v. Judicial Nominating Commission,*[10] then-President Judge Ridgely recognized an executive privilege to protect against disclosure of judicial nomination materials in a mandamus action on a Delaware freedom of information case. As to nomenclature, the *Guy* Court stated as follows:

> The phrase "executive privilege" has not been used with precision or uniformity by courts. It can apply to communications to and from the Presidents, or a governor. This privilege is sometimes also referred to as the "state secret privilege," the "official information privilege," or the "deliberative process privilege."[11]

The Court discussed the executive privilege held by the President and also by various governors. Finally, the Court recognized "as part of the constitutional and common law of the State the doctrine of executive privilege with respect to the source and substance of communications to and from the Governor in the exercise of

5. *DR Partners v. Bd. of County Com'rs of Clark County,* 116 Nev. 616, 6 P.3d 465 (2000).

6. *Fuller v. City of Homer,* 75 P.3d 1059 (Alaska 2003).

7. *California Native Plant Society v. United States Environmental Protection Agency,* 251 F.R.D. 408, 415 (N.D.Cal.).

8. *Nat'l Labor Relations Board v. Sears, Roebuck & Co.,* 421 U.S. 132, 148, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

9. *Id.* at 140, 95 S.Ct. 1504.

10. *Guy v. Judicial Nominating Commission,* 659 A.2d 777, 779 (Del.Super.).

11. *Id.* at 782 (internal citations omitted).

his appointive power." [12] There is no reference to the deliberative process privilege with its requirements that documents be pre-decisional and deliberative. This privilege plays no part in the *Guy* decision. The *Guy* Court recognized only the Governor's executive privilege.

Discussion of the deliberative process privilege in Delaware case law is rare. For example, in *Beckett v. Trice*, this Court stated as an aside "that the 'deliberative process privilege' does not exist in Delaware." [13]

The privilege was raised substantively in *Chemical Industry Council of Delaware, Inc. v. State Coastal Zone Industrial Control Bd. ("Chemical")*. [14] Then–Vice Chancellor Jacobs found the Board's Regulations to be void because the public was excluded from the Board's rule-making sessions. Although the Board argued in that its deliberative comments were protected by the deliberative process privilege, it provided no support for this position. Instead, the Board asked the Chancery Court to recognize a deliberative privilege. The Court rejected this request because it had no basis in Delaware statutory law or case law.

At argument in this case, the Department asserted that *Chemical* glossed over or misinterpreted the common law when discussing the State FOIA definition of a public record. The Department argues that the Delaware phrase "common law"

should embrace federal common law, which recognizes the deliberative process privilege. [15] However, the phrase clearly focuses on Delaware law, and the Court found no independent support for the privilege in the open meeting aspects of federal FOIA law. The distinction between Delaware and federal common law has been recognized in the Delaware District Court. [16]

Further, the *Chemical* Court observed that the thrust of the Delaware Freedom of Information Act is against secret government communications and cuts against the Department's position that it is a safe haven for a deliberative process privilege. [17]

An instructive case is found in *Republican Party of New Mexico v. New Mexico Taxation and Revenue Department*, ("*Republican Party*"). The New Mexico Supreme Court held that the New Mexico Constitution supported a qualified executive privilege for the Governor but that no basis existed for a deliberative process privilege applicable to state agencies. [18] Under federal law, the presidential communications privilege is rooted in constitutional separation of powers, while the deliberative process privilege is based on common law. [19] The states find various sources and applications of these privileges. Several states recognize a qualified executive privilege analogous to the federal executive privilege that is applicable only to governors. [20] Other states apply a

---

12. *Id.* at 785.

13. 1994 WL 319171 (Del.Super.1994).

14. 1994 WL 274295 (Del.Ch.).

15. *National Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 148, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975).

16. *Dobrich v. Walls*, 2006 WL 2642218, *6 (D.Del.)(stating that while deliberative process privilege is not recognized in Delaware a

qualified deliberative process privilege is recognized is under federal common law).

17. *Chemical Industry Council of Delaware, Inc., supra.*

18. 283 P.3d 853, 868 (N.M.2012)

19. *Id.* at 861.

20. *Id.* (citing *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980); *Nero v. Hyland*, 76 N.J. 213, 386 A.2d 846 (1978); *State ex rel.*

consolidation of the two privileges which is applicable both to the governor and to executive agencies.[21] Some states reject a common law deliberative process privilege,[22] and one state, Massachusetts, does not recognize any form of executive privilege.[23]

■ Within this range of possibilities, Delaware recognizes that the Governor enjoys a qualified executive privilege as set forth in *Guy*. *Guy*'s conclusion about the Governor is consistent with the Court's recognition of a qualified privilege for materials related to a criminal investigation is recognized in Delaware.[24] However, it is not extended to investigative reports in civil cases.[25]

As one court has put it, "when the government seeks affirmative relief, it is fundamentally unfair to allow it to evade discovery of materials that a private plaintiff would have to turn over," thus forcing the defendant to show its hand while the government holds out.[26] As argued by AMEC, the embankments may have been taken down for a number of reasons, and AMEC is entitled to Golder's information and analysis that may be presented at trial.[27]

At argument, the Department observed that no other State agency has asserted the deliberative process privilege.[28] Thus, the Department asks the Court to adopt, not the executive privilege as delineated in *Guy*, but a hybrid of two privileges, which would broaden the Governor's executive privilege to include the deliberative processes of State agencies and departments. To do so would be to act without Delaware precedent, and the Court declines to do so. Under Delaware's liberal discovery rules, "[p]arties may obtain discovery regarding any material, not privileged, which is relevant to the subject matter involved in the pending action." Rule 26(b)(1). The Golder documents sought by AMEC are not privileged and are within the scope of Rule 26 discovery.

■ **Balancing factors.** In jurisdictions that recognize the deliberative process privilege and where the government has met its burden of showing that the documents are pre-decisional and deliberative, the burden shifts to the adverse party to show that the privilege should be waived.[29] Several factors are to be considered in determining whether the sought-after documents should be produced.[30]

*Dann v. Taft*, 109 Ohio St.3d 364, 848 N.E.2d 472 (2006)).

21. *Id.* (citing *City of Colorado Springs v. White*, 967 P.2d 1042 (Colo.1998) (en banc); *Commonwealth v. Vartan*, 557 Pa. 390, 733 A.2d 1258 (1999); *Herald Ass'n, Inc. v. Dean*, 174 Vt. 350, 816 A.2d 469 (2002)).

22. *Id.* (citing *Sands v. Whitnall Sch. Distr.*, 312 Wis.2d 1, 754 N.W.2d 439 (2008); *People ex rel. Birkett v. City of Chicago*, 184 Ill.2d 521, 235 Ill.Dec. 435, 705 N.E.2d 48 (1998)).

23. *Babets v. Sec. of the Exec. Office of Human Servs.*, 403 Mass. 230, 526 N.E.2d 1261 (1988).

24. *Williams v. Alexander*, 1999 WL 743082 (Del.Super.).

25. *State of Delaware ex rel. M. Jane Brady v. Ocean Farm Ltd. P'ship*, 2002 WL 259955 (Del.Ch.2002).

26. *EEOC v. Citizens Bank and Trust Co. of Maryland*, 117 F.R.D. 366 (D.Md.1987).

27. Tr. at 40, ll.13–15.

28. Tr. at 8, ll.6–7.

29. *California Native Plant Society*, *supra* at 415.

30. *Apco Liquidating Trust v. United States*, 420 B.R. 648, 654 (Bankr.M.D.La.2009) (citing *Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F.3d 827 (3d Cir.1995)).

The first factor is the relevance of the evidence sought to be protected. Here, the Golder documents contain relevant data about the failure of the project and the reliability of AMEC's input. This is the heart of the matter and therefore relevant. The second factor asks whether other evidence is available to serve the same purpose. The answer is a straightforward "no." Golder gathered the data and compiled it into meaningful form. No other such data exist. The third factor asks whether the seriousness of the litigation and the issues warrant turning over the documents. The Department seeks affirmative relief between twenty and forty million dollars, and the issues and outcome affect the parties as well as the citizens of Delaware. This case is serious.

The fourth factor is the state's role in the litigation. The State filed this action, which has high stakes. The Department initiated the rebuilding of the Bridge, drafted the contract and identified the subcontractors to be retained by the general contractor. Departmental officials and staff were active in every phase of the construction, deconstruction and rebuilding. Because of the failure of the project and associated costs, the State brought the suit. The fifth factor asks whether state employees will be more timid when they realize that their communications may be discoverable. This risk is limited because the documents contain information and opinions, not intentional misinformation or disingenuous advice. Instead, they pertain to potential breaches of professional standards and to the possible contractual liabilities that are standard fare in commercial litigation and not of a sensitive character.

Having considered these factors, if the deliberative process privilege was available to the Department, the five factors weigh in AMEC's favor.

■ **Privilege log.** Even if Delaware recognized an executive/deliberative process privilege, the privilege log, prepared by the Department for the Golder documents, is deficient. Such a failure can be deemed to constitute a waiver unless the Court finds that the proponent has made a good faith effort to provide meaningful descriptions of the documents.[31]

■ As explained in *Klig v. Deloitte LLP*,[32] the purpose of a privilege log is to record sufficient information about each document to assess the propriety of the assertion of the privilege. While the *Deloitte* court addressed a log asserting the attorney/client privilege, an identical type of log is required for work product immunity, the executive/deliberative process privilege or other asserted privileges. The description of each document in the log must be " 'sufficiently detailed so that someone can actually assess whether it makes sense to challenge the document.' "[33]

■ The party claiming the privilege must identify (1) the date of each communication; (2) the parties to the communication, including both names and positions; (3) the attorneys involved; and the subject matter of each communique sufficient to show why the privilege is warranted, as well as whether it pertains to the decision or decisions in question, including facts to bring each document within the narrow reach of the privilege.[34]

AMEC seeks 178 documents which the Department asserts are protected by the

---

**31.** 2010 WL 3489735 (Del.Ch.).

**32.** *Id.*

**33.** *Id.* (quoting prior verbal ruling in same case).

**34.** *Id.* at *5.

DPP. The Department has submitted a privilege log theoretically designed to allow a judge to determine whether or not documents are protected.[35] Here, the privilege log is similar in significant ways to the privilege log rejected in *Deloitte* in insufficiency of detail and repetitive, meaningless entries. The log provides dates for all documents; document types such as "Handwritten notes" or "Memorandum"; and authors' and recipients' names, but without identification of their positions or identification of attorneys.

Under the key heading "Description," 105 entries state "analysis for embankment failure report" without elaboration. The remaining entries use the phrase "embankment failure" preceded by such words as "Discussion of," "notes and handouts," "Analysis of," "Needed interviews," "Notes to telephone conference," "Draft of" and "outline for." Based on this type of wording, Plaintiff argues that the facts are so entwined with opinions that the two cannot be extricated.

These types of entries did not suffice in *Deloitte*[36] and do not suffice here.

Further, Plaintiff's attorneys know the purpose of a privilege log and the correct way to prepare one. The log must show that each document is both pre-decisional and deliberative in order to qualify for protection.[37] A document is predecisional if it was "generated before the adoption of an agency policy" and deliberative if it "reflects the give-and-take of the consultative process."[38]

To be pre-decisional, a document must pertain to an anticipated agency decision and have been generated before the decision was made. It cannot be a communication about the decision after the decision has been adopted.[39] That is, documents may be shielded only if they were created or used in the decision-making process and disclosure would reveal the nature of the deliberations.[40] The Department, which has the burden of establishing the decision date, asserts that the E & O process was triggered in 2007 (at argument) or 2008 (in the Complaint). Taking either of these dates as the start of the E & O process, the only conclusion to be drawn is that Golder's submissions to the Department in 2008 and 2009 were post-decisional.

To be deliberative, a document must reflect "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."[41] A document that discloses personal opinions or "mental processes of decision-makers" is deliberative.[42] That is, an agency must include enough information for a court to determine " 'how each document fits into the deliberative process.' "[43] Simply to state that a document is advisory or deli-

---

**35.** *Id.* (addressing attorney/client privilege).

**36.** *Id.*

**37.** *California Native Plant Society, supra,* at 408.

**38.** *Electronic Frontier Foundation v. United States Dep't of Justice,* 890 F.Supp.2d 35 (D.D.C.2012).

**39.** *United States v. Pechiney Plastics Packaging, Inc.,* 2013 WL 1163514, *13 (D.N.J.) (citing *National Labor Relations Board,* 421 U.S. at 151–52, 95 S.Ct. 1504).

**40.** *Educ. Law Center v. New Jersey Department of Education,* 198 N.J. 274, 966 A.2d 1054 (2009).

**41.** *Id.* (quoting *National Labor Relations Board,* 421 U.S. at 150, 95 S.Ct. 1504).

**42.** *California Native Plant Society, supra* at 413.

**43.** *Id.* (quoting *Parke, Davis & Co. v. Califano,* 623 F.2d 1, 6 (6th Cir.1980)).

berative, as the Department has done, does not suffice. The record is clear that Golder was retained to gather data during deconstruction and analyze the data to determine why the decision to · deconstruct had been necessary. Golder had no role in the Department's deliberations but served instead an informational, analytic and investigatory role.

The privilege log fails to provide a basis by which an informed decision can be made about the claimed privilege for the documents. Further, counsel for the Department conceded that cutting and pasting appeared to have been part of the process of producing the log.[44] This replication does not suggest good faith, and was also rejected in *Deloitte*.[45] The Department's log does not provide sufficient detail or explanation to identify deliberative material for purposes of protecting the listed documents from discovery. Boilerplate and conclusory language are too vague to permit an informed decision.

 **Contractual dispute resolution.** Analysis of the dispute resolution process, here called the errors/omissions process, rests on well-established Delaware contract interpretation principles. The Court must attempt to ascertain the meaning of the contractual language and the intent of the parties, read from the perspective of a reasonable third party.[46] If a contractual provision is unambiguous, the plain language governs the issue under consideration.[47] The Court may not, in the guise

of construing a contract, supply an omission in its provisions.[48]

 AMEC argues that under the Agreement the Department has no basis for withholding the desired documents. The E & O provision provides:

The DEPARTMENT Project Manager shall document the error and/or omission that was identified, collect all supporting materials, review their findings with the CONSULTANT (Figg), determine the required action to correct the error and/or omission and analyze the cost impact of the resolution (including but not limited to materials, overtime, and force account).

A reasonable third person would read this provision as showing the parties' intent to establish an open communication process between the parties as to the findings made during the investigatory process. The language is unambiguous and the Court will not read into this provision a limitation on what is or what is not to be shared between the parties.

As the drafter of the Agreement, the Department could have defined or limited the materials it expected to withhold from the review process, but no such clause exists.[49] Thus, under the Agreement and specifically under the errors/omissions provisions, the Department is bound to supply the 178 documents AMEC seeks.

**Golder does not hold the privilege.** AMEC served the subpoena *duces tecum* on Golder, not the Department, which would hold the privilege. The Department

---

**44.** Tr. at 24.

**45.** *Klig v. Deloitte, supra*, *2 (stating that privilege log's description did not provide any "document-specific description" because a word processor had been used to copy and paste phrases).

**46.** *Shiftan v. Morgan Joseph Hldgs.*, 57 A.3d 928, 935 (Del.Ch.2012).

**47.** *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).

**48.** *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del.1969).

**49.** 4 Am.Jur.2d Alternative Dispute Resolution § 44.

asserts that the subpoena itself was in proper form and not objectionable. The point is that when the Department learned of the asserted privilege, it failed to either move to quash or otherwise take action.

### Conclusion

The Department has not met its burden of showing that the qualified deliberative process privilege applies to any of the 178 documents for which it claims protection. Even if the privilege did apply, the result of the balancing determination weighs in favor of production, and the Department's privilege log is inadequate. Even if Delaware recognized the deliberative privilege process, the parties' agreed-upon E & O process requires open disclosure of investigatory materials. The documents for which the Department asserts the deliberative process privilege are available to AMEC under Rule 26(b).

AMEC's motion to compel is **GRANTED.**

**IT IS SO ORDERED.**

